**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| H.M., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>et al.,<br><br>*Defendants.* | **Civil Action No. 4:26-CV-00536-O**<br><br>**JURY DEMANDED** |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

1. This case is about a federal prison that became a hunting ground. For years, the Bureau of Prisons ("BOP") knew that Federal Medical Center Carswell ("FMC Carswell") in Fort Worth, Texas harbored a systemic culture of sexual abuse. At least twelve staff members have been convicted of sexually abusing incarcerated women there since 1997. Congressional investigations documented the crisis. The Department of Justice's own watchdogs sounded the alarm. Yet the BOP did nothing meaningful to stop it. Against that backdrop of known risk and inadequate oversight, Danny Franco ("Franco") was able to carry out the depraved conduct alleged here.

2. Franco was a correctional officer assigned to supervise the biomedical equipment repair unit ("biomed") at FMC Carswell. From at least 2020 through June 2024, Franco systematically identified and sexually assaulted at least six women under his direct control. He did so regularly, openly, and with impunity.

3. Franco's method for assaulting women was deliberate and calculated. Biomed offered coveted prison jobs that paid incarcerated women well and offered transferable work training—and Franco controlled who got those jobs. He used that power to recruit vulnerable women into his orbit. Once there, he supplied them with contraband (including alcohol, pills, and outside food) and then demanded sex. When they complied, he escalated the abuse. When they resisted, he threatened them with guns, showed them satellite images of their families' homes, and described a "kill kit" he kept in his vehicle. He claimed the "kill kit" had everything he needed to get away with murder, including "kill switches" and survival food.

4. Franco fortified his operation with the precision of a predator. He rigged a doorbell on the basement door, where biomed was located, to alert him when anyone approached. He cut the surveillance camera wires in his office ceiling. He called ahead on the radio to confirm the coast was clear. He fired women from the biomed job if they refused his advances—a threat that further silenced them, because reporting Franco meant losing their jobs.

5. Franco's efforts to conceal his abuse were themselves red flags that should have prompted investigation. These were not the actions of an employee following protocol; they were the hallmarks of someone with something to hide. Yet despite these obvious warning signs, the BOP never intervened.

6. The abuse was not well hidden. One plaintiff, C.L., appeared at her work assignment with visible bruises on her face and neck for months. Franco choked her, hit her, and forced her to wear makeup so he could rub it off with his genitals. Other incarcerated individuals, BOP staff, and BOP supervisors saw these visible signs. Yet no supervisor, warden, or investigator intervened to protect these women for over four years.

7. This pattern of systematic abuse was not the failure of a single rogue officer. This was the predictable, foreseeable, and preventable consequence of institutional indifference. The Prison Rape Elimination Act ("PREA") and its implementing regulations impose mandatory, non-discretionary duties on the BOP to screen staff, train personnel, investigate allegations, protect reporters from retaliation, and eliminate conditions that enable abuse. The BOP violated every one of these duties at FMC Carswell. The binding PREA regulations, *see* 28 C.F.R. §§ 115.11 through 115.78, are not aspirational. They are the federal government's own standard of care, and the BOP failed to meet them.

8. Defendants Michael Carr, Michael Smith, Tyal Rule, Jonathan Clark, and Raul Campos—all of whom served as warden or associate warden of FMC Carswell at some point between 2020 and 2024—did not act as reasonable officers in their positions and/or ignored overt and obvious signs of sexual abuse. They personally failed to supervise Franco, investigate known complaints, and/or enforce the PREA standards they were charged with implementing. Their dereliction enabled Franco's years-long sexual abuse.

9. Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680 and Texas common law to hold the Defendants accountable for the significant and continuing harm these women suffered and to help ensure that no other woman in the custody of FMC Carswell endures the suffering they endured.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over Plaintiffs' FTCA claims pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1), which grant district courts exclusive jurisdiction over civil actions against the United States for money damages for injury caused by the negligent or

wrongful act or omission of a government employee acting within the scope of employment.

11. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same case or controversy as Plaintiffs' federal claims.

12. This Court has jurisdiction under 28 U.S.C. § 1343(a)(4) for claims to recover damages or secure equitable relief under any Act of Congress providing for the protection of civil rights.

13. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(e)(1) because FMC Carswell is located within this district, all tortious acts and omissions occurred within this district, and Defendant Franco resides within this district.

## III. CHOICE OF LAW

14. Under the FTCA, the law of the place where the tortious act or omission occurred provides the substantive rules of decision. 28 U.S.C. § 1346(b)(1). Because all acts and omissions giving rise to Plaintiffs' claims occurred at FMC Carswell in Fort Worth, Texas, Texas law supplies the applicable substantive standards for Plaintiffs' tort claims.

## IV. PARTIES

15. Plaintiff H.M. is a woman who was incarcerated at FMC Carswell from 2019 through at least 2023. Defendant Franco sexually abused H.M. from approximately 2020 through 2023. H.M. is still incarcerated in the BOP at Western Massachusetts Women's Corrections Center.

16. Plaintiff J.P. is a woman who was incarcerated at FMC Carswell beginning in 2017. Defendant Franco sexually abused J.P. from approximately 2020 through 2021. J.P. was released from BOP custody in June 2023 and currently resides in Arkansas.

17. Plaintiff A.L. is a woman who was incarcerated at FMC Carswell beginning in October 2019. Defendant Franco sexually abused A.L. in approximately September 2021 and repeatedly from November 2022 through May 2023. A.L. was released from BOP custody in June 2026 and currently resides in Georgia. She remains on supervised release.

18. Plaintiff K.T. is a woman who was incarcerated at FMC Carswell beginning in November 2017. Defendant Franco sexually abused K.T. for approximately six months in early-to-mid-2022. K.T. was released from BOP custody in October 2024 and currently resides in Texas.

19. Plaintiff J.G. is a woman who was incarcerated at FMC Carswell beginning in 2014. Defendant Franco sexually abused J.G. in approximately the fall of 2022. J.G. has resided in a halfway house in Texas since May 2026.

20. Plaintiff C.L. is a woman who was incarcerated at FMC Carswell beginning in 2014. Defendant Franco sexually abused C.L. from approximately December 2022 through June 1, 2024. During one five-month period in 2023, Defendant Franco sexually abused C.L. daily, Monday through Thursday. C.L. is currently incarcerated at FMC Carswell.

21. At all relevant times, each Plaintiff was a federal prisoner in the custody and control of the United States of America, acting through the BOP. Each Plaintiff was entirely dependent upon the BOP for her safety, security, medical care, and protection from harm. Each Plaintiff was unable to leave the prison or remove herself from danger. The United States, through the BOP, owed each Plaintiff the highest duty of care owed by a custodian to those in its custody.

22. Defendant United States of America is the sovereign entity that, through the BOP, operates FMC Carswell and employs the correctional staff therein. The United States is the sole proper defendant for claims brought under the FTCA. 28 U.S.C. § 2679(b)(1).

23. Defendant Franco is a former correctional officer at FMC Carswell who served as the officer in charge of the biomedical equipment repair unit as early as 2015. Franco is sued in his individual capacity. At all relevant times, Franco was a law enforcement officer of the United States as defined by 28 U.S.C. § 2680(h).

24. Defendant Michael Carr served as Warden of FMC Carswell from June 2019 to May 2022. Carr is sued in his individual capacity. Carr had ultimate authority over personnel decisions, institutional safety, and PREA compliance at FMC Carswell during his tenure. Carr knew or should have known of the pattern of sexual abuse occurring under his command and failed to take corrective action.

25. Defendant Michael Smith served as Warden of FMC Carswell from May 2022 to 2023. Smith is sued in his individual capacity. Smith had ultimate authority over personnel decisions, institutional safety, and PREA compliance at FMC Carswell during his tenure. Smith knew or should have known of the pattern of sexual abuse occurring under his command and failed to take corrective action.

26. Defendant Tyal Rule served as Warden of FMC Carswell from 2023 to the present. Rule is sued in his individual capacity. Rule had ultimate authority over personnel decisions, institutional safety, and PREA compliance at FMC Carswell during his tenure. Rule knew or should have known of the pattern of sexual abuse occurring under his command and failed to take corrective action.

27. Defendant Jonathan Clark served as Associate Warden of FMC Carswell from April 2020 to June 2020. Clark is sued in his individual capacity. Clark had direct supervisory authority over correctional officers, including Franco, and was responsible for ensuring compliance with PREA and BOP policy. Clark knew or should have known of Franco's sexual misconduct and failed to investigate, discipline, or terminate Franco.

28. Defendant Raul Campos served as Associate Warden and Acting Warden of FMC Carswell during portions of the relevant time period. Campos is sued in his individual capacity. Campos had direct supervisory authority over correctional officers, including Franco, and was responsible for ensuring compliance with PREA and BOP policy. Campos knew or should have known of Franco's sexual misconduct and failed to investigate, discipline, or terminate Franco.

## V. FACTUAL ALLEGATIONS

### A. FMC Carswell has a documented history of systemic sexual abuse.

29. FMC Carswell is the only administrative security federal medical center for women in the United States. It houses some of the most vulnerable women in federal custody with serious medical and mental health needs. It is located in Fort Worth, Texas.

30. Since at least 1997, FMC Carswell has been plagued by a documented, recurring pattern of sexual abuse. At least twelve staff members have been criminally convicted of sexually abusing women at the prison during that time.

31. In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of five counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a

ward, and aggravated sexual abuse.[1]

32. In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[2]

33. In 2024, one prisoner at FMC Carswell reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[3]

34. From 2012 to 2022, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Franco raped Plaintiffs.[4]

35. Between 2014 and 2018, 35 women reported sexual abuse at FMC Carswell[5]— the highest known rate of reported sexual abuse at any federal women's prison in the United States, until recent news about FCI Dublin.[6]

36. In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman

---

[1] Michael Rigby, *Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted*, PRISON L. NEWS (May 15, 2007), https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

[2] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG (May 5, 2008), https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[3] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS (Sept. 25, 2024), https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[4] STAFF OF S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFAIRS, PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS (Comm. Print 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

[5] Kaley Johnson, *Exclusive: Fort Worth Carswell women's prison plagued by sexual abuse, cover-ups*, JUST DETENTION INTERNATIONAL (Sep. 2, 2022), https://justdetention.org/exclusive-fort-worth-carswell-womens-prison-plagued-by-sexual-abuse-cover-ups/.

[6] The widespread sexual abuse at FCI Dublin is documented in *California Coalition for Women Prisoners, et al. v. United States, et al.*, Case No. 4:23-cv-4155-YGR (N.D. Cal.).

under his custody. He was convicted in 2017.[7]

37. In 2021, Lieutenant Luis Curiel sexually abused three incarcerated women at FMC Carswell. He was reported in June or July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners. He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women under his custody at FMC Carswell. That an officer at Curiel's rank, a lieutenant who supervised other correctional officers, could engage in repeated sexual abuse without consequence sent a clear message to staff that such conduct would be tolerated.[8]

38. Recently, the DOJ's internal investigations, following the revelation of rampant abuse at FCI Dublin, identified that nearly two-thirds of BOP facilities have documented sexual abuse allegations, including FMC Carswell.[9]

39. Two women incarcerated at FMC Carswell filed lawsuits related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.[10]

40. Nix took women to isolated areas of the prison, outside the view of cameras, and FMC Carswell staff failed to intervene.[11]

41. A BOP staff member who worked at FMC Carswell described the prison as "the perfect

---

[7] Press Release, U.S. Attorney's Office for the Northern District of Texas, Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate (Nov. 7, 2017), https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

[8] *See United States v. Luis Curiel*, 4-22-cr-00132-P-1 (N.D. Tex. 2022).

[9] U.S. Senate Permanent Subcommittee on Investigations, "Sexual Abuse of Female Inmates in Federal Prisons" (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 66–68.

[10] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA NEWS (Mar. 11, 2024), https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

[11] *Id.*

place for sexual misconduct." She remained anonymous for fear of retaliation. This same officer had previously reported a lieutenant for exchanging drugs for sex and was subsequently retaliated against and fired.[12]

42. This pattern of sexual abuse at FMC Carswell has been ongoing and openly discussed for more than two decades. In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*." That Amnesty Report detailed:

> Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[13]

The Amnesty Report found that the BOP has been plagued with systemic sexual abuse for years, revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.[14] The Amnesty Report was widely circulated and read by responsible corrections professionals.

43. Despite the audits, lawsuits, news articles, and criminal referrals drawing attention to the pattern of sexual abuse at FMC Carswell, the abuse has continued. Defendants failed to take appropriate action to prevent future abuse, such as that experienced by Plaintiffs, and continued to allow male staff, including Defendant Franco, to spend a significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.

---

[12] Ghaliyah Ali, *Prison or Predator's Playground? 'FMC Carswell's Dirty Secret,'* THE SAN ANTONIO OBSERVER (Aug. 26, 2025), https://saobserver.com/prison-or-predators-playground-fmc-carswells-dirty-secret/; Complaint & Jury Demand at 13, *Doe v. United States*, No. 4:24-cv-00209-P (N.D. Tex. March 6, 2024), Dkt. No. 1.

[13] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody* (March 1999), https://www.amnesty.org/en/documents/amr51/001/1999/en/.

[14] *Id.*

44. The culture at FMC Carswell, whereby Defendants failed to investigate allegations of sexual abuse, document, track, or reprimand known sexual predators, and otherwise monitor and protect prisoners at FMC Carswell—and across BOP prisons— directly led to Plaintiffs' abuse.

**B. Federal investigations repeatedly identified systemic failures to prevent sexual abuse within the BOP.**

45. The crisis at FMC Carswell exists within a broader pattern of BOP-wide failure to protect incarcerated people from sexual abuse. Multiple federal investigations have documented these systemic failures across BOP prisons throughout the country. This documentation was well-known by Defendants.

46. Despite the knowledge that correctional staff sexually abuse prisoners in their custody, Defendants continue failing to take appropriate steps to protect those in their custody.

47. An investigation published by the Associated Press in 2021 documented that over a hundred federal prison workers had been arrested, convicted, or sentenced for crimes since 2019, including a correctional officer and drug treatment specialist at a Kentucky prison medical center who threatened prisoners' and their families' lives to coerce them into sexual acts.[15]

48. The Associated Press also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official in charge of investigating staff misconduct, who was the subject of complaints and arrests himself.[16]

49. In July 2022, a DOJ working group was tasked to address "reported and proven sexual

---

[15] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR (Nov. 14, 2021), https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[16] *Id.*

misconduct by Federal [BOP] employees." The group reviewed the DOJ's approach to monitoring and deterring employee sexual misconduct by looking at the "hundreds of [incidents of] sexual abuse perpetrated by its employees over the past five years."[17]

50. The working group noted long-standing, pervasive problems throughout the BOP that needed fixing. Those problems included long-standing insufficient reporting mechanisms, "flawed investigations," and "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[18]

51. Additionally, the working group determined that the "culture and environment in BOP facilities" needed to change to address the rampant sexual violence.[19] They also found that formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator.[20]

52. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."[21]

53. One particular problem it found was that, until the early 2020s, "[Special Investigative Services] officers were encouraged during initial intake interviews to obtain from victims

---

[17] Principal Assoc. Deputy Att'y Gen. Working Group of DOJ Components, U.S. Dep't of Just.., *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, (Nov. 2, 2022), https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."[22]

54. This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited.[] At the same time, requiring such sworn statements run[s] counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."[23]

55. The working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[24]

56. The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[25]

57. The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

58. The working group also found that investigations into staff sexual abuse were fundamentally flawed, that sanctions for substantiated misconduct were inadequate, and

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

that an institutional culture existed within the BOP that discouraged reporting and protected abusers.[26]

59. Additionally, the working group recommended that the BOP develop an "early warning system" in order to detect signs that staff may be engaged in sexual conduct and to identify BOP employees with a history of abuse.[27]

60. This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit without any systemic tracking or identification.

61. Had the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, been in place before 2021, Plaintiffs likely would have been spared from these frequent, violent assaults.

62. In 2022, the United States Senate Permanent Subcommittee on Investigations conducted hearings on sexual abuse in the federal prison system and documented pervasive institutional failures at BOP prisons nationwide.[28]

63. In October 2022, the DOJ Office of Inspector General ("OIG") issued a memorandum finding that the BOP was "reluctant to rely on inmate testimony" in sexual abuse investigations—a structural bias that emboldened abusive staff and silenced victims.[29] The OIG found that this reluctance to credit the testimony of incarcerated people was a primary factor in the failure to detect and stop serial abusers.

---

[26] *Id.*

[27] *Id.*

[28] *Supra* n.4.

[29] Memorandum from Michael E. Horowitz, Inspector General, to Colette S. Peters, Director of the Federal Bureau of Prisons, Re: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees (Oct. 12, 2022), https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

64. On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct."[30] GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[31] While that number includes all employee misconduct allegations, BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[32] Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[33]

65. The BOP's Office of Internal Affairs maintained a backlog of approximately 8,000 unresolved misconduct allegations during the relevant period—a fact known to BOP leadership.[34]

66. The BOP's administrative remedy system had a resolution rate of less than two percent during the period when Defendant Franco was sexually abusing Plaintiffs, rendering it essentially useless as a mechanism for women in prison to report sexual abuse and receive meaningful institutional response.

67. In 2024, the court in the FCI Dublin class action found that the BOP "has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully

---

[30] U.S. Gov't Accountability Office, *Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct* (Sept. 2025), https://www.gao.gov/assets/gao-25-107339.pdf.

[31] *Id*. at 28.

[32] *Id*. at 43.

[33] *Id*.

[34] *Supra* n.4 at 4.

apprised of the situation for years."[35]

68. When deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP prisons and that BOP leadership "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[36]

69. The court made that determination in part because of the delays in action by the BOP Central Office, which first received complaints of sexual abuse from FCI Dublin in 2019 but did not start prosecuting these cases until 2021.[37]

70. In 2024, a Special Master Report unearthed a series of deficiencies at FCI Dublin, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI-Dublin."[38]

71. The report's findings detailed the failures of the central BOP office, including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[39]

72. The Special Master also found that "management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of [adults in custody] at great risk for many years."[40]

73. The Special Master found "numerous operational, policy and constitutional violations" across the BOP, including the failure of the Central Office.[41]

---

[35] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024).

[36] *Id.* at 736.

[37] *Id.* at 737.

[38] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024* (June 5, 2024), https://www.courthousenews.com/wp-content/uploads/2024/08/fci-dublin-still-report-real.pdf.

[39] *Id*.

[40] *Id*.

[41] *Id*.

74. The Special Master also reported that the BOP had "no standard protocol to report violations."[42]

75. The Special Master also noted that the BOP-wide data showed less than a 2% grant rate for Administrative Remedies, which was "difficult to justify."[43]

76. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[44]

77. Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that at that specific prison, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint."[45]

78. Specific examples included five Dublin class members at Carswell who reported they had filed many PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating officers in each case found no action was warranted, even though policy dictates that these incidents should have been referred to the Office of Internal Affairs.[46]

79. The Report also found that "there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff, at FMC Carswell, regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] Wendy Still, 2nd Monthly Status Report (May 1 - 31, 2025) in *California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al.*, Consent Decree, Case No. 4:23-cv-04155-YGR, at 55, *available at* https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf.

[46] *Id.* at 56.

level."[47]

80. In another report, the Special Master found that PREA Compliance Monitors ("PCMs") at each BOP prison, including FMC Carswell, "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[48]

### C. Federal law imposed mandatory PREA and BOP duties on Defendants that they failed to follow.

81. Congress enacted the Prison Rape Elimination Act of 2003, 34 U.S.C. § 30301 *et seq*., to establish a zero-tolerance standard for sexual abuse in confinement facilities. The Attorney General promulgated binding implementing regulations at 28 C.F.R. Part 115, effective August 20, 2012.

82. These regulations impose mandatory, non-discretionary duties on the BOP and its employees. They require compliance; thus agency officials have no discretion to comply or not. The duties imposed by PREA regulations are ministerial, not discretionary, and therefore fall outside the discretionary-function exception to FTCA liability. 28 U.S.C. § 2680(a).

83. Defendants and the BOP violated the following mandatory PREA regulations at FMC Carswell with respect to each Plaintiff:

[47] *Id.*

[48] Wendy Still, 1st Quarterly Status Report (March 31 - June 30, 2025) in *California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al.*, Consent Decree, Case No. 4:23-cv-04155-YGR, at 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf.

a. **28 C.F.R. § 115.13 (Supervision and monitoring):** Requires sufficient supervision of prisoners through appropriate staffing levels, video monitoring, and staff placement to protect prisoners from sexual abuse. The BOP failed to monitor the biomed area, allowed Franco to operate in an unsupervised basement, and failed to detect that Franco had cut surveillance camera wires.

b. **28 C.F.R. § 115.17 (Hiring and promotion decisions):** Requires the agency to not hire or promote anyone who has engaged in sexual abuse, and to conduct background checks and ongoing monitoring. The BOP hired Franco despite his prior criminal conviction for public solicitation involving oral-genital sex—a sexual offense that should have put the United States on high alert when considering his employment at a federal women's prison. The BOP continued to employ Franco—and increased his pay multiple times during his employment—despite PREA investigations and known misconduct.

c. **28 C.F.R. § 115.61 (Staff reporting duties):** Requires that all staff immediately report any knowledge, suspicion, or information regarding sexual abuse or sexual harassment. Staff at FMC Carswell observed indicators of Franco's abuse, including visible injuries on prisoners and widely discussed rumors amongst prisoners, and failed to report.

d. **28 C.F.R. § 115.67 (Agency protection against retaliation):** Requires the agency to protect prisoners and staff who report sexual abuse from retaliation. Franco retaliated against women who refused him by, for example, firing them from the biomed job, and no supervisor intervened. Franco told victims that prior PREA

reports against him went nowhere, effectively advertising the futility of reporting to further immunize his misconduct.

e. **28 C.F.R. § 115.71(a) (Criminal and administrative investigations):** Requires prompt, thorough, and objective investigation of all allegations of sexual abuse. Prior PREA complaints against Franco were not adequately investigated, which emboldened him and facilitated his further abuse of prisoners. Franco also was allowed to continue in his position with unsupervised access to female prisoners.

f. **28 C.F.R. § 115.76 (Disciplinary sanctions for staff):** Requires that staff who violate agency sexual abuse policies be subject to disciplinary sanctions up to and including termination, and makes termination the "presumptive disciplinary sanction for staff who have engaged in sexual abuse." Franco was not disciplined despite prior PREA investigations, and he was permitted to continue abusing prisoners for years.

84. In addition to the mandatory PREA regulations discussed above, BOP Program Statement 3420 (Standards of Employee Conduct) and BOP Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) impose independent, non-discretionary duties on BOP officials.[49]

85. With respect to Program Statement 3420, the BOP failed to report Franco's sexual misconduct within the 24-hour period that the Program Statement mandates. That failure did not involve any policy judgment or allocation of institutional resources. It was a failure

---

[49] BOP Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) was replaced by BOP Program Statement 5333.01 (Sexually Abusive Behavior Prevention and Intervention Program Manual), effective March 19, 2026. The mandatory duties described herein remain substantively unchanged in the new Program Statement.

to comply with a fixed, non-discretionary reporting deadline that BOP officials had no authority to disregard.

86. Program Statement 5324.12 imposes a similarly mandatory, non-discretionary duty. The Program Statement expressly provides that allegations of sexually abusive behavior are to receive prompt intervention upon report, requires all staff to report immediately any knowledge, suspicion, or information regarding an incident of sexual abuse, and requires the agency to take immediate action to protect a prisoner upon learning that the prisoner is subject to a substantial risk of imminent sexual abuse.

87. Despite Program Statement 5324.12's express prompt intervention requirement, the BOP failed to intervene at all in response to sexually abusive behavior by Franco or to Plaintiffs' allegations of that abuse. As alleged above, staff and supervisors at FMC Carswell, including Defendants, who observed, should have observed as a reasonable officer, or received information indicating that Franco was sexually abusing prisoners (including visible injuries, contraband, and widely circulated rumors) took no action to investigate, separate, or otherwise protect Plaintiffs from Franco, in direct violation of Program Statement 5324.12's mandatory intervention requirement.

88. Because Program Statements 3420 and 5324.12 mandate specific, non-discretionary conduct rather than affording BOP officials room for policy-based judgment calls, Defendants' violations of these Program Statements fall outside the discretionary function exception and provide an independent basis for Plaintiffs' claims.

**D. Defendant Franco engaged in a deliberate and repeated pattern of coercion and sexual abuse against Plaintiffs.**

89. Franco exploited his position as officer-in-charge of the biomed unit to systematically identify, recruit, and sexually abuse women at FMC Carswell. His method was consistent

across victims and time, demonstrating a deliberate, premeditated pattern of predatory behavior.

90. The biomed job was among the most coveted prisoner work assignments at FMC Carswell. It paid well by prison standards and offered a degree of autonomy and comfort. Additionally, it provided training that would be applicable for employment upon release from prison. Franco controlled who received and who kept this assignment, giving him direct power over the economic opportunities for the women in his charge.

91. Franco used contraband as a mechanism of control. He brought alcohol, prescription pills, food from outside the prison, and other prohibited items into the prison. By accepting these items, prisoners felt that they were complicit in violations which made them less likely to report Franco's escalating sexual demands.

92. Franco operated primarily in the basement of the biomed building. He rigged a doorbell on the basement door to alert him when anyone approached. He cut the wires to surveillance cameras in his office ceiling. He called ahead on the radio to verify no supervisors were in the area.

93. When women resisted or expressed reluctance, Franco escalated his threats. He showed some of the victims firearms that he owned. He described in detail a "kill kit" he kept in his vehicle. He showed prisoners satellite imagery of their families' homes—communicating an unmistakable threat that his reach extended beyond prison walls.

94. Franco told multiple victims that prior PREA investigations against him had resulted in no consequences—an assertion that was, devastatingly, true. This functioned both as a threat (reporting will accomplish nothing) and as an assurance of impunity (no one will believe you over me).

95. The BOP's failure to repudiate Franco's conduct after receiving PREA complaints, including one from Plaintiff in January of 2024, constitutes ratification of his actions under Texas law. Unlike cases where an employer immediately places an offending officer on administrative leave upon learning of misconduct, the BOP here took no corrective action against Franco. Despite having knowledge of PREA investigations against Franco and knowing of his misconduct spanning several years, the BOP failed to place him on leave, remove him from his supervisory position over female prisoners, or restrict his unsupervised access to vulnerable prisoners. Instead, the BOP permitted Franco to continue abusing prisoners for years. This failure to repudiate Franco's prior unlawful acts—when the BOP had the knowledge of facts necessary to repudiate such conduct—renders Franco's subsequent sexual assaults the acts of the BOP itself.

96. Franco punished women who refused him by firing them from the biomed assignment. This economic retaliation served a dual purpose: it removed resistant women from his proximity, and it signaled to other prisoners that compliance was the price of their livelihood.

97. Franco assaulted multiple women simultaneously—maintaining overlapping sexual relationships with several prisoners at the same time during 2022 and 2023.

### E. Each Plaintiff endured coercion, violence, and abuse while under Defendants' control.

***Plaintiff H.M. (abused 2020–2023)***

98. H.M. entered BOP custody in 2019 and was transferred to FMC Carswell. She was assigned to work in the biomed unit under Franco's supervision beginning in 2020.

99. Shortly after H.M. began working with Franco, he began being sexually inappropriate.

100. Initially, Franco made inappropriate, sexual jokes to H.M., progressing into prolonged hugs and groping H.M.'s breasts, buttocks, and legs.

101. One day, shortly after H.M. began working in biomed, Franco invited H.M. into his office, where he forced her to perform oral sex on him.

102. After forcing H.M. to perform oral sex on him, Franco vaginally penetrated her with his penis.

103. Plaintiff H.M. was scared and did not want to have sex with Franco but was terrified about what might happen if she did not perform the acts he forced her to do.

104. Shortly after, Franco began providing H.M. with contraband items, including food, alcohol, and pills. In doing so, he created an atmosphere of dependency.

105. H.M. does not know how Franco was able to get this contraband into the facility.

106. While FMC Carswell officers are allowed to bring in food for personal consumption, alcohol and pills are always prohibited.

107. Had other staff exercised reasonable care by conducting routine inspections, monitoring items brought into the facility, or observing the behavior of incarcerated women in Franco's unit, they would have noticed Franco bringing in alcohol and pills.

108. In the mornings when she worked, Franco would force H.M. to touch his penis and masturbate him.

109. Over the course of the next month, Franco forced H.M. to perform oral sex on him and vaginally penetrated with his penis her over ten more times. These acts occurred in the biomed basement and Franco's office.

110. When he was not sexually assaulting her, Franco would talk with H.M. about all the guns he owned and would show her photos of them on his computer.

111. H.M. reasonably interpreted this as a threat not to report Franco.

112. In one instance, Franco sexually assaulted and raped H.M. and J.P. at the same time. During this encounter, Franco forced both H.M. and J.P. to their hands and knees, where he then vaginally penetrated H.M with his penis. Afterwards, Franco forced the women to perform oral sex on him.

113. Franco regularly talked to H.M. about how he had previously been investigated, on more than one occasion, but that nothing came from it.

114. This furthered H.M.'s belief that there was no point in reporting Franco because he had already gotten away with sexually assaulting other women.

115. At some point after this encounter, H.M. began refusing Franco, and she was fired shortly after.

116. It was difficult for H.M. to get another job after being fired from the biomed job.

117. In December 2022, H.M. saw Franco again, when he told her that his whole crew had been fired and that he thought she was great at her job and wanted someone who knew what she was doing.

118. H.M. agreed to work with him, but she told Franco that she did not want it to be how it was before, meaning being forced to engage in sexual acts with him.

119. He agreed and said that it would not be like that again.

120. Franco continued being vulgar, however, and would force H.M. into extended hugs.

121. In January 2023, Franco brought H.M. into the dialysis room. When there, he forced H.M. to perform oral sex on him.

122. Shortly after, Franco propositioned H.M., but she refused.

123. H.M. was fired in February 2023.

124. In January 2024, along with some of the other Plaintiffs, H.M. came forward to file a PREA report on Franco and spoke with the OIG.

125. Upon information and belief, officers were aware of these acts but failed to properly investigate or act to prevent further abuse.

126. Given the obviousness with which Franco sexually abused H.M., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

127. PREA regulations mandate staff reporting where BOP staff have any "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment." 28 C.F.R. § 115.61(a). Despite these regulations, Defendant United States and its agents, staff, servants, contractors, and employees had numerous opportunities to follow those mandates and stop Franco's misconduct and did not do so.

128. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

129. H.M. was unable to consent to any sexual contact with Franco. Under 18 U.S.C. § 2243(b), a prisoner in federal custody is legally incapable of consenting to sexual contact with a correctional officer, regardless of any claimed acquiescence. Franco held total authority over H.M.'s work assignment, daily conditions, and safety.

130. H.M. is a survivor of childhood sexual abuse and sexual abuse in adulthood. The rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

131. H.M. suffered from, and continues to suffer from, deep depression, anxiety, nightmares, and insomnia. She did not know how to maneuver through everything and continues to struggle with the effects of this trauma today.

132. H.M. suffered severe physical and psychological injuries as a result of Franco's abuse, including post-traumatic stress disorder, depression, anxiety, sleep disturbance, hypervigilance, and lasting emotional harm.

***Plaintiff J.P. (abused 2020–2021)***

133. J.P. arrived at FMC Carswell in 2017. She was assigned to work in the biomed unit under Franco's supervision in December 2019.

134. At this point, J.P. had heard rumors about Franco being inappropriate with women.

135. Franco had only been friendly to her and had not begun making sexual jokes or using vulgar language.

136. J.P. believed that she could manage the situation so that she would not be abused herself and was desperate to have the biomed job.

137. Franco began providing J.P. with contraband and then escalated to sexual abuse.

138. Franco's sexual comments began to increase over time. He would tell J.P. how beautiful she was and that he wanted to be her pimp.

139. In one particular instance, Franco put his hand on her thigh and rubbed her. This made J.P. incredibly uncomfortable, but she was in shock and did not know what to do.

140. At some point in February 2020, Franco brought J.P. and another prisoner into his back office, where he gave them both cough syrup.

141. Franco told both women that they were beautiful and deserved better lives.

142. J.P. left the office but later learned that Franco sexually assaulted her friend after she left.

143. Later that month, Franco brought J.P. alone to his office and led her to the back room near his office. He then forced J.P. to perform oral sex on him.

144. J.P. reasonably believed that she had no choice and could not say no to Franco.

145. Franco forced her to perform oral sex on him at least two more times and manually masturbate him several additional times.

146. One time Franco was sitting in his chair in his office with J.P. and another prisoner. Franco ordered J.P. to go into the back room with him, where he then forced her to manually masturbate him, saying that she "didn't need to put her lips on it this time."

147. In another instance, Franco forced J.P. and another prisoner into his back room. While there, he forced J.P. to pull her pants down. Franco was about to vaginally penetrate her, but he stopped, telling her that she was shaking too badly.

148. J.P. started avoiding Franco and was able to avoid his continued sexual advances.

149. J.P. felt that she could not come forward to report Franco because he had been there for so long and knew that other officers would defend him and that he would not be reprimanded.

150. Franco also regularly told J.P. that he had previously been investigated for a PREA violation, but that nothing came from it, and the woman who reported him lost her job and reputation and faced regular retaliation by officers.

151. J.P. believed that if she came forward, no one would believe her and that she would be retaliated against.

152. At the end of 2021, Plaintiff J.P. quit her biomed job as she believed Franco would start retaliating against her because she refused him.

153. A separate officer came to J.P. shortly after she quit her biomed job, requesting that she take the job back because they needed employees who were skilled at fixing the dialysis machine.

154. A reasonable officer should have been concerned with the turnover at the biomed job.

155. J.P. took the biomed job back and was able to avoid Franco's continued sexual advances until she was transferred shortly thereafter.

156. In 2022, J.P. was transferred to FCI Aliceville.

157. Franco used his authority over J.P.'s work assignment and daily conditions to coerce her compliance. J.P. was unable to consent to any sexual contact with Franco as a matter of law. 18 U.S.C. § 2243(b).

158. J.P. suffered severe physical and psychological injuries as a result of Franco's abuse. Plaintiff J.P. is a survivor of childhood sexual abuse and the sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma. She spiraled into a deep depression, faced low self-worth and insecurity, and suffered from anxiety.

159. Additionally, as a result of this sexual trauma, J.P. was no longer able to comfortably have sex with her husband, which was a significant factor that led to their ultimate divorce.

160. The foregoing are permanent injuries resulting directly from Defendants' deliberate indifference to J.P.'s health and safety, Defendants' disregard of the excessive risk of harm to J.P.'s health and safety, and/or Defendants' negligent failure to promptly protect J.P. from foreseeable assaults.

161. J.P. was released from BOP custody in June 2023 and currently resides in Arkansas, where she continues to suffer the lasting effects of the trauma inflicted upon her.

***Plaintiff A.L. (abused 2021–2023)***

162. A.L. arrived at FMC Carswell during the relevant period in 2021.

163. In September 2021, she interviewed to work in the biomed unit under Franco's supervision.

164. During the interview, Franco was flirty and used vulgar language. Franco asked her questions about her personal relationships and sex.

165. Within a few weeks after A.L. began working for Franco, he called her into his office, where it was just the two of them. He began talking explicitly and aggressively about sex.

166. Then, Franco forced A.L. to perform oral sex on him.

167. Shortly after, A.L., unrelatedly, was given a Segregated Housing Unit ("SHU") sentence and lost her job.

168. Then, in November 2022, Franco sought A.L. out and rehired her.

169. Although A.L. was uncomfortable, she needed the money from this job and also feared possible retaliation from Franco if she did not take it.

170. After she began working in November 2022, Franco's sexual abuse drastically increased.

171. Franco required A.L. to perform oral sex on him whenever he demanded it, amounting to at least once or twice a week.

172. He would call A.L. into a separate room in the back of his office, where he would force her to perform oral sex on him.

173. A.L. was reluctant, but felt like she had no choice or ability to say no in the matter.

174. Over the course of the next five months, Franco would also show A.L. videos of him at a shooting range and photographs of the many different guns he owned.

175. He told A.L. that he had a "kill kit" that he was ready to use.

176. Franco also told A.L. that he had previously been investigated for PREA reports, but that nothing came from it.

177. A.L. believed that no one would believe her if she were to report him and that he might physically hurt her if she decided to come forward.

178. Around March 2023, Franco called A.L. and C.L. into his back office.

179. When there, Franco forced both A.L. and C.L. to perform oral sex on him at the same time. Thereafter, Franco vaginally penetrated A.L. with his penis.

180. In May 2023, A.L. was again written up and sentenced to the SHU, on an unrelated charge.

181. When she was released from the SHU, A.L. had heard rumors that Franco had been walked off FMC Carswell.

182. Upon hearing this, she felt safe enough to come forward, and she reported Franco and was interviewed by the OIG.

183. A.L. was unable to consent to any sexual contact with Franco as a matter of law. 18 U.S.C. § 2243(b). A.L. suffered severe physical and psychological injuries as a result of Franco's abuse.

184. Defendants' acts caused A.L. severe mental, physical, and emotional harm and exacerbated her underlying mental health diagnoses. A.L. is a survivor of childhood sexual abuse and the rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

185. She spiraled into a deep depression, facing constant anxiety and nightmares. She is terrified of all other BOP officers and feels unsafe and unprotected.

186. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of

harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect A.L. from foreseeable assaults.

***Plaintiff K.T. (abused 2022)***

187. K.T. entered BOP custody in November 2017 and was incarcerated at FMC Carswell. She interviewed and was hired to work in the biomed unit under Franco's supervision in early to mid-2022.

188. During the interview, Franco was professional with K.T. However, within the first week, Franco called K.T. into his office. He told her about what she would be responsible for and other expectations of the job, then he told her that, "Your responsibility is to keep my ass in this chair and my dick wet, is that going to be a problem?"

189. K.T. was uncomfortable but laughed it off and left the office.

190. During the next several weeks, Franco would routinely pull K.T. into his office and make comments about what she would be willing to do to maintain this job. He would point to her mouth, vagina, and butt, asking her if she would be okay with "it" going there, suggesting putting his penis in any of the places he pointed.

191. K.T. was uncomfortable during these encounters but was fearful of what Franco might do and worried she might be retaliated against.

192. One of the next times Franco pulled K.T. into his office, he made her go into the back room adjacent to his office.

193. Franco led K.T. to the couch in this room and told her he needed to pat her down.

194. During this pat down, however, Franco groped K.T.'s breasts and ran his hands over her genitalia and buttocks. He then spanked her.

195. Franco pulled K.T. into his office at least three other times where the same interaction transpired: Franco groped K.T.'s breasts, genitalia, and buttocks.

196. During one of these occasions, Franco forced K.T. to put her hand on his penis and manually masturbate him.

197. After these interactions, Franco became pushier with K.T. to have sex with him. K.T. kept trying to make jokes and otherwise distract Franco.

198. K.T. was terrified to outright say "no" to Franco's abuse because of the potential retaliation she had seen other women at FMC Carswell experience.

199. Ultimately, six months after K.T. began working in biomed, Franco fired her.

200. K.T. did not receive any reasons for the firing.

201. Because of the abruptness and Franco's persistence in sexually assaulting K.T., she holds the reasonable belief that she was fired because she would not engage in further sexual acts with Franco.

202. K.T. was unable to consent to any sexual contact with Franco as a matter of law. 18 U.S.C. § 2243(b). K.T. suffered severe physical and psychological injuries.

203. Defendants' acts caused K.T. severe mental and emotional harm and exacerbated her underlying mental health diagnoses.

204. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect K.T. from foreseeable assaults.

205. K.T. was released from BOP custody in October 2024 and currently resides in Texas, where she continues to suffer the lasting effects of Franco's abuse.

***Plaintiff J.G. (abused 2022)***

206. J.G. arrived at FMC Carswell in 2014. She interviewed and was assigned to work in the biomed unit under Franco's supervision in the fall of 2022.

207. During the interview, Franco told J.G. that it was her job to "make sure my dick stays wet."

208. Although J.G. was uncomfortable, she thought she would be able to avoid Franco's advances, and she needed the money from the biomed job.

209. Initially, Franco would make sexual comments and innuendos to J.G. He would tell her that he wished he knew her back in her college days and that when he retired, he wanted to open a sex business and have J.G. work for him.

210. In November 2022, Franco called J.G. into his office. He was sitting in the back room adjacent to his office. When she entered, Franco told her to sit on his desk, right next to where he was sitting at the desk.

211. He then told J.G. to spread her legs. J.G. was uncomfortable but was terrified to say no or otherwise refuse.

212. Franco then proceeded to rub J.G.'s genitalia and forced her to rub his penis.

213. During their conversations, Franco regularly told J.G. that he had previously been investigated for a PREA violation, but that nothing came from it. He told her that if she were to report him, no one would believe her either.

214. J.G. eventually came forward after several Office of Internal Affairs officers approached her after other women had given them her name.

215. Although J.G. did report Franco at this point, she was terrified about the retaliation she would experience.

216. During the times that J.G. worked in biomed for Franco, she heard from other incarcerated women about the rumors going around FMC Carswell about Franco. These rumors included that he was sexually assaulting the women in biomed.

217. Upon information and belief, officers were aware of these rumors but failed to properly investigate or act to prevent further abuse.

218. J.G. was unable to consent to any sexual contact with Franco as a matter of law. 18 U.S.C. § 2243(b).

219. Defendants' acts caused J.G. severe mental, physical, and emotional harm and exacerbated her underlying mental health diagnoses. J.G. is a survivor of childhood sexual abuse and the rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

220. J.G. has suffered from, and continues to suffer from, anxiety, closing herself off to others, and blacking out for extended periods of time.

221. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect J.G. from foreseeable assaults.

222. J.G. is currently in a halfway house in Texas, still under BOP custody.

***Plaintiff C.L. (abused 2022–2024)***

223. C.L. was incarcerated at FMC Carswell as early as 2014 and assigned to work in the biomed unit under Franco's supervision at the end of 2022.

224. The week before Christmas 2022, Franco called C.L. into his office. When C.L. entered Franco's office, he went to the door and locked the door. He then forced C.L. to perform oral sex on him.

225. C.L. was incredibly uncomfortable and did not know what to do but did not believe she could say no. C.L. left that day feeling a lot of shame and embarrassment.

226. The abuse quickly escalated in both frequency and severity. For more than five consecutive months, Franco sexually assaulted C.L. on a daily basis, Monday through Thursday, when she reported to work in the biomed unit.

227. Franco's abuse of C.L. was uniquely violent. He choked her. He hit her. He forced her to apply makeup so that he could rub it off with his penis. In at least one instance, Franco used his thumb to penetrate C.L. in the anus. He left visible bruises on her face and neck that were apparent to other prisoners and staff.

228. C.L.'s visible injuries went unreported by staff. No supervisor investigated why a prisoner under Franco's supervision repeatedly appeared with bruises on her face. This failure violated multiple mandatory PREA reporting and investigation requirements.

229. Franco subjected C.L. to forced oral sex, vaginal penetration, manual masturbation, and other degrading sexual acts.

230. Franco threatened C.L. with firearms and his "kill kit." Franco would also regularly tell C.L. about his "kill kit," full of various guns, and that he would "eat a bullet" before going to prison.

231. Franco had ready access to weapons. He and his wife operated D&S Custom Tactical, a business selling custom AR-15 rifles from their Fort Worth residence, which held a Federal Firearms License.

232. He showed her satellite images of her family's home to force her silence.

233. C.L. believed that if she were to report Franco, he might harm her family since he knew where they lived.

234. During the time that Franco was sexually assaulting C.L., he would regularly call over the radio for 2 North, the unit C.L. was incarcerated in, to send C.L. down to his office.

235. This happened frequently and in a manner that should have raised suspicion with other staff at FMC Carswell, had they been acting as reasonable officers.

236. Additionally, C.L. witnessed Franco cutting wires that were in the ceiling of his office. C.L. believed these wires connected to possible surveillance video.

237. Upon information and belief, officers were aware of rumors about this act and should have noticed the loss of surveillance video or sound in his office but failed to properly investigate or act to prevent further abuse.

238. On June 1, 2024, the day that Franco was walked off FMC Carswell, he forced C.L. to perform oral sex on him in the morning, and then again later that afternoon.

239. C.L. held the reasonable belief that if she were to have come forward, she would not have been believed, and that she would face serious retaliation for reporting Franco.

240. C.L. was unable to consent to any sexual contact with Franco as a matter of law. 18 U.S.C. § 2243(b).

241. Defendants' acts caused C.L. severe mental, physical, and emotional harm and exacerbated her underlying mental health diagnoses. C.L. is a survivor of childhood sexual abuse and the rape and sexual abuse she suffered at the hands of Franco, and as a result of Defendants' failures, exacerbated this trauma.

242. C.L. has suffered from, and continues to suffer from, deep depression, sleeping problems, and frequent nightmares. She has a hard time eating and has lost weight since Franco's abuse.

243. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect C.L. from foreseeable assaults.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

244. The FTCA requires that a claimant first present her claim to the appropriate federal agency before filing suit in federal court. 28 U.S.C. § 2675(a). A claim is deemed denied if the agency fails to make a final disposition within six months of filing. *Id.*

a. H.M. filed her Standard Form 95 ("SF-95") administrative tort claim with the BOP on October 31, 2024. The BOP acknowledged receipt on November 6, 2024. More than six months have elapsed without final disposition. H.M.'s claim is deemed denied by operation of law. H.M. has exhausted her administrative remedies.

b. J.P. filed her SF-95 administrative tort claim with the BOP on November 13, 2024. The BOP has not acknowledged receipt. More than six months have elapsed without final disposition. J.P.'s claim is deemed denied by operation of law. J.P. has exhausted her administrative remedies.

c. A.L. filed her SF-95 administrative tort claim with the BOP on October 31, 2024. The BOP acknowledged receipt on November 6, 2024. More than six months have elapsed without final disposition. A.L.'s claim is deemed denied by operation of law. A.L. has exhausted her administrative remedies.

d. K.T. filed her SF-95 administrative tort claim with the BOP on July 28, 2025. The BOP expressly denied K.T.'s claim on August 23, 2025. K.T. has exhausted her administrative remedies. Plaintiffs initiated this lawsuit in D.C. on November 25, 2025, within six months of K.T.'s administrative denial. *See* 1:25-cv-04164-CRC (Nov. 25, 2025).

e. J.G. filed her SF-95 administrative tort claim with the BOP on October 31, 2024. The BOP acknowledged receipt on November 6, 2024. More than six months have elapsed without final disposition. J.G.'s claim is deemed denied by operation of law. J.G. has exhausted her administrative remedies.

f. C.L. filed her SF-95 administrative tort claim with the BOP on October 31, 2024. The BOP acknowledged receipt on November 6, 2024. More than six months have elapsed without final disposition. C.L.'s claim is deemed denied by operation of law. C.L. has exhausted her administrative remedies.

## VII. EQUITABLE TOLLING

245. To the extent any statute of limitations defense is raised with respect to Plaintiff K.T.'s claims, the applicable limitations period is subject to equitable tolling.

246. K.T. was incarcerated at FMC Carswell, under the total physical control of the BOP and its officers, during the period of Franco's abuse and for more than two years thereafter. She was not released until October 2024.

247. During her incarceration, K.T. reasonably feared retaliation for reporting Franco's abuse. Franco had explicitly told K.T. and other victims that prior PREA complaints against him went nowhere. Franco possessed firearms, maintained a "kill kit," and had demonstrated willingness to use violence. K.T. observed that women who displeased Franco were fired

from their positions and subjected to other adverse consequences such as placement in the SHU.

248. Placement in the SHU could mean loss of privileges, including not being able to use the phone or tablet to talk to loved ones, not being able to go outside, not being able to have regular showers, and not accessing commissary and other food and hygiene items.

249. K.T. found counsel as soon as she was reasonably able.

250. K.T.'s circumstances were extraordinary. She was confined in a unit where her abuser operated with impunity, where institutional protections had demonstrably failed, where the administrative remedy system resolved less than two percent of complaints, and where the very officials charged with her protection were complicit in enabling Franco's conduct. Under these circumstances, K.T. exercised reasonable diligence in pursuing her rights but was prevented from doing so by factors beyond her control.

251. Equitable tolling is warranted because: (a) K.T. faced extraordinary circumstances that prevented timely filing, including reasonable fear of physical retaliation by an armed correctional officer with demonstrated violent tendencies; (b) K.T. was under the total custodial control of the entity responsible for her injuries; (c) K.T. had no meaningful access to legal resources or information regarding her rights while incarcerated; (d) K.T. has been diligently pursuing these claims at least since being released from prison; and (e) K.T. filed her SF-95 claim within a reasonable time after her release from BOP custody.

## VIII. CAUSES OF ACTION

### COUNT I: NEGLIGENCE UNDER THE FEDERAL TORT CLAIMS ACT (AGAINST THE UNITED STATES)

252. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

253. At all relevant times, the United States, through the BOP, owed Plaintiffs a legal duty to exercise reasonable care to protect them from unreasonable risks of harm. The BOP has a duty, among other things, to provide those in its custody with suitable quarters; provide for their safekeeping, care, and subsistence; and provide for their protection, instruction and discipline.

254. At all relevant times, Defendant United States of America acted negligently in its indifference to Plaintiffs' safety.

255. At all relevant times, Defendant United States of America employed correctional and administrative employees, including the individual Defendants, as well as other colleagues and supervisors of Defendant Franco.

256. At all relevant times, Defendant United States of America's employees were acting within the scope of their employment, in their official uniforms during work hours, as federal employees of the United States.

257. At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and act in accordance with standards of reasonable care.

258. At all relevant times and within the scope of their employment by Defendant United States of America, the individual Defendants and unknown staff, while working within their official capacities at FMC Carswell, owed a duty to Plaintiffs while they were at FMC Carswell.

259. Here, the risk that correctional officers would sexually abuse Plaintiffs and other prisoners at FMC Carswell was plainly foreseeable. Plaintiffs were confined, uniquely vulnerable, and entirely dependent on the BOP for their safety, placing them squarely within the class

of persons foreseeably harmed by inadequate supervision and unchecked staff misconduct. The above-mentioned long, pervasive, and documented history of sexual abuse at FMC Carswell also made Plaintiffs' abuse foreseeable, as did the history of reports against Franco and his known misconduct.

260. In addition to a custodial duty owed to Plaintiffs, the United States was statutorily obligated under PREA and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Plaintiffs.

261. Despite this duty, the United States breached its obligation to exercise reasonable care by failing to take necessary steps to mitigate or eliminate the known risk of harm, including:

a. Failing to adequately supervise Franco despite his assignment to an isolated, unsupervised work area with daily unsupervised access to female prisoners;

b. Failing to investigate prior complaints or indicators of misconduct against Franco or to take any meaningful corrective action in response to those complaints;

c. Failing to monitor the biomed area through functioning surveillance equipment, and failing to investigate or remediate Franco's disabling of the existing surveillance by cutting camera wires;

d. Failing to enforce PREA's mandatory reporting requirements, such that staff who observed signs of Franco's abuse, including visible injuries on C.L., did not report;

e. Failing to protect prisoners who reported or might report Franco from retaliation;

f. Failing to comply with the mandatory, non-discretionary requirements of 28 C.F.R. §§ 115.11, 115.13, 115.17, 115.43, 115.61, 115.67, 115.71(a), and 115.76, and BOP Program Statements 5324.12 and 3420.11;

g. Failing to track or analyze sexual abuse data at FMC Carswell despite the prison's documented history of sexual abuse;

h. Maintaining a culture and institutional environment at FMC Carswell in which sexual predators operated without meaningful oversight or accountability; and

i. Failing to maintain its facilities in a manner to deter the possibility of sexual abuse.

262. Due to the United States' herein described acts and omissions, it breached its duty to protect Plaintiffs and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees.

263. The United States' above-described acts and omissions were a direct and proximate cause of Plaintiffs' injuries and damages herein.

264. As a direct and proximate result of the United States' negligence, Plaintiffs suffered and continue to suffer severe physical injuries, emotional distress, psychological trauma, post-traumatic stress disorder, depression, anxiety, loss of enjoyment of life, and other compensable damages.

## COUNT II: NEGLIGENT HIRING, SUPERVISION, TRAINING, AND RETENTION UNDER THE FEDERAL TORT CLAIMS ACT (AGAINST THE UNITED STATES)

265. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

266. The United States, through the BOP, hired correctional and administrative employees at FMC Carswell—including Franco, the other individual Defendants, and other colleagues and supervisors of Franco—and allowed them to use their positions of power within the prison to exert influence over prisoners such as Plaintiffs.

267. In addition, by assigning Franco to supervise biomed, the BOP gave him a position of heightened power with unsupervised access to and influence over female prisoners.

268. At all relevant times, the United States' employees were acting within the scope of their employment, in their official uniforms during work hours, as federal employees of Defendant.

269. At all relevant times and within the scope of their employment by the United States, FMC Carswell staff, while working within their official capacities, owed a duty to Plaintiffs while they were at FMC Carswell.

270. The United States knew or should have known had it exercised reasonable care, that Franco had a propensity to sexually abuse prisoners, due to his past disciplinaries received at FMC Carswell, the widespread rumors about his misconduct, the visual evidence of his physical abuse of incarcerated women including Plaintiff C.L., and his prior criminal conviction for a sexual offense.

271. Defendant United States of America knew that potential abusers such as Defendant Franco would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

272. The United States breached its duties by failing to use ordinary care in hiring, supervising, training, and retaining Franco, including by:

a. Failing to conduct an adequate investigation into Franco's background, qualifications, and prior misconduct despite a position that gave him direct access to vulnerable prisoners;

b. Failing to adequately supervise Franco despite assigning him to an isolated work area with unsupervised access to female prisoners;

c. Failing to train staff on mandatory reporting, monitoring, and prevention requirements necessary to detect and stop sexual abuse;

d. Failing to take corrective action after receiving complaints or observing indicators of misconduct;

e. Failing to monitor Franco's conduct or ensure compliance with PREA requirements; and

f. Retaining Franco despite knowledge, or constructive knowledge, that his continued employment created an unreasonable risk of harm to Plaintiffs.

273. The United States knew or should have known of the risk posed to Plaintiffs and other prisoners that they would be sexually assaulted by BOP employees such as Franco.

274. The United States also failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA requirements that would have deterred sexual abuse, such as that suffered by Plaintiffs.

275. Due to the United States' herein described acts and omissions, it breached its duty to protect Plaintiffs and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees.

276. If Defendant United States of America had properly supervised employees, facility staff such as Defendant Franco would not have been able to sexually abuse prisoners.

277. If Defendant United States of America had conducted thorough investigations of reported employees, Defendant Franco would not have been able to continue sexually abusing prisoners, including Plaintiffs.

278. If Defendant United States of America had properly supervised and investigated employees such as Defendant Franco and his supervisors, it would have learned of his propensity to commit sexual abuse.

279. The United States' above-described acts and omissions were a direct and proximate cause of Plaintiffs' injuries and damages herein.

280. As a direct and proximate result of the United States' negligence, Plaintiffs suffered and continue to suffer severe physical injuries, emotional distress, psychological trauma, and other compensable damages.

**COUNT III: GROSS NEGLIGENCE UNDER THE FEDERAL TORT CLAIMS ACT (AGAINST THE UNITED STATES)**

281. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

282. The conduct of the United States, through the BOP and the leadership of FMC Carswell, constitutes gross negligence under Texas law.

283. The acts and omissions of the United States involved an extreme degree of risk, considering the probability and magnitude of the potential harm. The United States permitted a known environment of staff-on-prisoner sexual abuse to persist, assigned Franco to an isolated and unsupervised setting with direct access to vulnerable prisoners, and failed to implement required monitoring and safeguards—conditions presenting a clear likelihood of severe physical and psychological harm.

284. The United States had actual awareness of the risk. The United States was repeatedly placed on notice of the risk through decades of documented sexual abuse at FMC Carswell, prior PREA complaints, federal investigations identifying systemic failures, and observable indicators of ongoing abuse. This evidence demonstrates that the United States was aware of the extreme risk posed by staff sexual misconduct and by Franco specifically.

285. Despite this knowledge, the United States proceeded with conscious indifference to the rights, safety, and welfare of Plaintiffs. The United States failed to act in the face of repeated warnings, declining to supervise Franco, investigate complaints, enforce

safeguards, or protect vulnerable prisoners. These failures go beyond mere negligence and reflect a deliberate disregard of known and serious risks.

286. The United States' gross negligence was a proximate cause of Plaintiffs' injuries.

**COUNT IV: SEXUAL ASSAULT AND BATTERY UNDER TEXAS COMMON LAW (AGAINST FRANCO)**

287. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

288. Defendant Franco committed sexual assault and battery on each of the Plaintiffs.

289. Franco intentionally and knowingly made repeated and unwanted physical and sexual contact with Plaintiffs, including forced oral sex, forced manual masturbation, vaginal penetration, anal penetration, unwanted touching, choking, and physical violence, all without Plaintiffs' consent.

290. Further, it was impossible for Plaintiffs to provide consent under 18 U.S.C. § 2243(b).

291. Franco acted within the scope of his authority and employment as a federal employee at FMC Carswell.

292. Plaintiffs reasonably believed that Franco was in a position of control or authority, and that they did not have the ability to consent or not consent to sexual acts that he initiated.

293. With the intent to cause harmful or offensive contact, Franco subjected Plaintiffs to sexual acts to which they could not consent. These acts were deeply offensive and provocative to their personal dignity and would offend a person of ordinary sensitivity.

294. Franco's conduct placed Plaintiffs in apprehension of imminent harmful or offensive bodily contact. Given Franco's demonstrated access to weapons, his threats against their families, his physical violence, and his position of total control over their daily lives, Plaintiffs reasonably feared that Franco would subject them to further sexual abuse and physical harm if they resisted or reported his conduct.

295. The above-described acts and omissions were a direct and proximate cause of Plaintiffs' serious physical and emotional harm.

**COUNT V: SEXUAL ASSAULT AND BATTERY UNDER THE FEDERAL TORT CLAIMS ACT (AGAINST THE UNITED STATES)**

296. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

297. Plaintiff brings this claim under the FTCA for sexual assault and battery against Defendant United States of America, based on the conduct of its officer, Defendant Franco.

298. Defendant Franco committed sexual assault and battery on each of the Plaintiffs, as described previously.

299. Plaintiffs did not consent to Franco's physical and sexual contact, nor could they provide consent under 18 U.S.C. § 2243(b).

300. Plaintiffs reasonably believed Defendant Franco was in a position of control or authority, and that they did not have the ability to consent or not consent to sexual acts that he initiated.

301. Franco was a law enforcement officer of the United States within the meaning of 28 U.S.C. § 2680(h), and he acted within the scope of his authority and employment at FMC Carswell.

302. Defendant Franco's intentional torts—including his sexual assault and battery of Plaintiffs—caused Plaintiffs' physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

303. The United States is also liable for Franco's sexual assaults under a theory of ratification. Unlike cases where an employer immediately places an offending officer on administrative leave upon learning of misconduct, the BOP here failed to repudiate Franco's conduct

despite having actual knowledge of prior PREA complaints against him and despite clear, visible signs of Franco's abuse as described herein.

304. The BOP received prior PREA complaints regarding Franco's sexual misconduct. Franco himself repeatedly told his victims that he had been investigated for prior PREA reports but that "nothing came from it." Despite this knowledge, the BOP: (a) failed to place Franco on administrative leave or terminate him; (b) failed to remove Franco from his supervisory position over female inmates; (c) failed to restrict Franco's unsupervised access to vulnerable prisoners; (d) failed to investigate the complaints thoroughly or objectively; and (e) permitted Franco to continue his pattern of sexual abuse for years. By failing to repudiate Franco's prior unlawful acts when the BOP had both the right and the knowledge of facts necessary to do so, the BOP ratified Franco's conduct, making his sexual assaults against Plaintiffs the acts of the United States itself.

305. The above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST FRANCO)

306. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

307. Defendant Franco's acts and omissions described herein constituted extreme and outrageous conduct, which caused Plaintiffs severe and debilitating emotional distress. Their emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

308. Franco intended to cause Plaintiffs severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused, threatened,

intimidated, and psychologically and physically dominated them while he was supposed to be providing custodial care.

309. Beyond the sexual assaults themselves, Franco engaged in a separate and independently actionable pattern of extreme and outrageous conduct designed to terrorize, intimidate, and psychologically dominate Plaintiffs. Franco showed victims satellite imagery of their families' homes—an unmistakable threat that his reach extended beyond prison walls. He described in detail a "kill kit" he kept in his vehicle, claiming it contained everything he needed to get away with murder, including "kill switches" and survival food. He showed victims his extensive firearms collection and videos of himself at shooting ranges. He told victims that he would "eat a bullet" before going to prison—communicating that he had nothing to lose. And he punished women who refused his advances by firing them from their coveted biomed positions, weaponizing their dependence to coerce and silence. This conduct, independent of the underlying sexual assaults, exceeds all bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized society.

310. At all relevant times, Defendant Franco was acting within the scope of his employment at FMC Carswell, and used his authority as supervisor of biomed to sexually assault Plaintiffs, while Plaintiffs did not have the ability to consent or withhold consent

311. Defendant Franco's acts and omissions were a direct and proximate cause of Plaintiffs' serious physical and emotional harm.

312. As a result of FMC Carswell personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of Defendant Franco's conduct as described herein, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional

distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

**COUNT VII: NEGLIGENCE UNDER TEXAS COMMON LAW (AGAINST CARR, SMITH, RULE, CLARK, CAMPOS)**

313. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

314. At all relevant times, Defendants Carr, Smith, Rule, Clark, and Campos owed Plaintiffs a legal duty to exercise reasonable care to protect them from unreasonable risks of harm.

315. Defendants Carr, Smith, Rule, Clark, and Campos breached their duty of care. Defendants' breaches include, but are not limited to: failing to investigate known complaints and warnings about Franco's conduct; failing to supervise Franco or monitor the biomed unit; failing to act on visible signs of abuse, including physical injuries on prisoners under Franco's supervision; failing to enforce mandatory PREA protocols designed to prevent and detect sexual abuse; and failing to remove Franco from his position despite actual or constructive knowledge that his continued employment created an unreasonable risk of harm.

316. Defendants' breaches were a proximate cause of Plaintiffs' injuries. The prolonged sexual abuse of Plaintiffs was the foreseeable result of Defendants' failures to supervise, monitor, investigate, and take corrective action regarding Franco's conduct.

317. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered and continue to suffer severe physical injuries, emotional distress, psychological trauma, post-traumatic

stress disorder, depression, anxiety, loss of enjoyment of life, and other compensable damages.

**COUNT VIII: NEGLIGENT HIRING, SUPERVISION, TRAINING, AND RETENTION UNDER TEXAS COMMON LAW (AGAINST CARR, SMITH, RULE, CLARK, CAMPOS)**

318. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

319. Defendants Carr, Smith, Rule, Clark, and Campos, as wardens and associate wardens of FMC Carswell, owed Plaintiffs a duty to use ordinary care to supervise, train, and—where necessary—remove employees who posed an unreasonable risk of harm to inmates.

320. Defendants Carr, Smith, Rule, Clark, and Campos hired, supervised, and retained Defendant Franco and allowed him to use his position of power as a BOP employee within the facility to exert influence over prisoners such as Plaintiffs.

321. Defendants' specific breaches included: failing to adequately supervise Franco despite his unsupervised access to vulnerable female inmates; failing to train personnel to recognize, report, and respond to indicators of staff sexual misconduct; failing to investigate PREA complaints and other reports concerning Franco; failing to monitor Franco's conduct or ensure compliance with PREA requirements; and failing to take corrective action against Franco despite knowledge, or constructive knowledge, that his continued access to prisoners created an unreasonable risk of harm.

322. If Defendants had adequately supervised Franco, conducted thorough investigations, trained personnel, or monitored Franco's conduct, Defendant Franco would not have been able to continue sexually abusing prisoners, including Plaintiffs.

323. Defendants Carr, Smith, Rule, Clark, and Campos knew, or should have known had they exercised reasonable care, that Defendant Franco was an unfit BOP employee prior to his assault of Plaintiffs.

324. There was abundant evidence that Defendant Franco had inappropriate relationships with prisoners and was bringing in contraband, acts which should have resulted in Defendants Carr, Smith, Rule, Clark, and Campos investigating and then terminating Defendant Franco.

325. Even if Defendants Carr, Smith, Rule, Clark, or Campos did not have actual knowledge that Defendant Franco had brought in illegal drugs and had inappropriate relations with other prisoners, it would have been obvious had they exercised reasonable care and reasonably performed their job duties.

326. Yet, Defendants Carr, Smith, Rule, Clark, and Campos continued to employ Defendant Franco, which put Plaintiffs at an unreasonable risk of harm.

327. Defendants' breaches were a proximate cause of Plaintiffs' injuries.

328. Plaintiffs' injuries were foreseeable. Franco's prolonged sexual abuse of Plaintiffs was the foreseeable result of Defendants' failure to supervise, inadequately train personnel, and take corrective action against an employee with unsupervised access to vulnerable inmates.

329. As a direct and proximate result of Defendants' negligent hiring, supervision, training, and retention, Plaintiffs suffered and continue to suffer severe physical injuries, emotional distress, psychological trauma, and other compensable damages.

**COUNT IX: GROSS NEGLIGENCE UNDER TEXAS COMMON LAW (AGAINST CARR, SMITH, RULE, CLARK, CAMPOS)**

330. Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

331. The conduct of Defendants Carr, Smith, Rule, Clark, and Campos constitutes gross negligence.

332. The acts and omissions of Defendants involved an extreme degree of risk, considering the probability and magnitude of the potential harm. Defendants permitted a known environment of staff-on-prisoner sexual abuse to persist at FMC Carswell, allowed Franco to operate in an isolated and unsupervised setting with direct access to vulnerable prisoners, and failed to implement required monitoring and safeguards—conditions presenting a clear likelihood of severe physical and psychological harm.

333. Defendants had actual awareness of the risk. Defendants were repeatedly placed on notice of the risk through decades of documented sexual abuse at FMC Carswell, prior PREA complaints against Franco, federal investigations identifying systemic failures, and observable indicators of ongoing abuse including visible injuries on inmates. This evidence demonstrates that Defendants were aware of the extreme risk posed by staff sexual misconduct and by Franco specifically.

334. Despite this knowledge, Defendants proceeded with conscious indifference to the rights, safety, and welfare of Plaintiffs. Defendants failed to act in the face of repeated warnings, declining to supervise Franco, investigate complaints, enforce safeguards, or protect vulnerable inmates. These failures go beyond mere negligence and reflect a deliberate disregard of known and serious risks.

335. Defendants' gross negligence was a proximate cause of Plaintiffs' injuries. Plaintiffs are entitled to exemplary damages in addition to compensatory damages.

## COUNT X: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORT CLAIMS ACT (AGAINST THE UNITED STATES)

336. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

337. Defendant United States of America's acts and omissions herein constituted extreme and outrageous conduct, which caused Plaintiffs' severe emotional distress following Franco's abuse.

338. Defendant United States of America intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

339. Beyond the sexual assaults themselves, Franco engaged in a separate and independently actionable pattern of extreme and outrageous conduct designed to terrorize, intimidate, and psychologically dominate Plaintiffs.

340. Franco acted intentionally or with reckless disregard of the probability that his conduct would cause Plaintiffs severe emotional distress. He knew that his victims were uniquely vulnerable, that they could not escape his control, and that threats to their families—combined with his demonstrated access to weapons and willingness to use violence—would cause them profound psychological harm. His conduct was designed not merely to facilitate sexual abuse, but independently to terrorize, humiliate, and dominate Plaintiffs through fear.

341. As a direct and proximate result of Franco's extreme and outrageous conduct, Plaintiffs suffered severe emotional distress. Their emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it. Plaintiffs suffered and continue to suffer debilitating psychological trauma, including post-traumatic stress disorder, depression, anxiety, nightmares, hypervigilance, and lasting emotional harm.

342. At all relevant times, Defendant Franco was acting within the scope of his employment at FMC Carswell and using his authority as supervisor of biomed.

343. The United States is liable for Franco's intentional infliction of emotional distress under the FTCA's law enforcement proviso, 28 U.S.C. § 2680(h), because Franco was a law enforcement officer acting within the scope of his employment.

344. The United States is also liable for Franco's intentional infliction of emotional distress under a theory of ratification. As alleged above, the BOP received prior PREA complaints regarding Franco's sexual misconduct, yet failed to place Franco on administrative leave, failed to remove him from his supervisory position over female inmates, failed to restrict his unsupervised access to vulnerable prisoners, and permitted him to continue his pattern of abuse for years. By failing to repudiate Franco's prior unlawful acts when the BOP had both the right and the knowledge of facts necessary to do so, the BOP ratified Franco's conduct.

345. As a direct and proximate result of Franco's intentional infliction of emotional distress—for which the United States is liable—Plaintiffs suffered and continue to suffer severe emotional distress, psychological trauma, and other compensable damages.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs H.M., J.P., A.L., K.T., J.G., and C.L. respectfully pray that this Court enter judgment in their favor and against Defendants, and award the following relief:

A. Compensatory damages in an amount to be determined at trial, including damages for physical injuries, emotional distress, psychological trauma, pain and suffering, mental anguish, loss of enjoyment of life, and all other compensable injuries;

B. Punitive and exemplary damages against Defendants Franco in his individual capacity in an amount sufficient to punish his egregious conduct and deter similar conduct in the future;

C. Nominal damages;

D. Costs of court, reasonable attorneys' fees, and litigation expenses, to the extent permitted by law;

E. Pre-judgment and post-judgment interest at the highest rate permitted by law;

F. Such other and further relief, at law or in equity, as this Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Date: July 31, 2026

Respectfully submitted,

HAYNES AND BOONE, LLP

*/s/ Victor D. Vital*
VICTOR D. VITAL
State Bar No.: 00794798
victor.vital@haynesboone.com
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5329

LAUREN BROGDON
State Bar No. 24082736
lauren.brogdon@haynesboone.com
CHLOE WARNBERG
State Bar No. 24131741
chloe.warnberg@haynesboone.com
CHELBY STERLING
State Bar No. 24143437
chelby.sterling@haynesboone.com
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2006

-and-

THE LAW OFFICE OF DEBORAH M. GOLDEN

BEX KOLINS
North Carolina Bar No. 58491
bkolins@debgoldenlaw.com

700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
Tel.: (202) 630-0332

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This is to certify that on July 31, 2026, the foregoing was filed electronically with the Court which will send a notice of electronic filing to all counsel of record.

*/s/ Chelby Sterling*
Chelby Sterling